Good morning, Your Honors. Winter King on behalf of Plaintiff and Appellant Upper Southeast Communities Coalition, and I would like to try to reserve about five minutes of my time for rebuttal. In my time this morning, I'd like to address four issues, the first being to just quickly touch on the standard of review. Would you keep your voice up, please? Oh, yes. I'll get a little closer. Is that better? Much better. Okay. First, I'd like to touch on the standard of review for this appeal, a hot topic in the arguments we've already heard this morning. And then getting to the merits of the case, I'd like to discuss three reasons why this court should reverse the district court's determination that the coalition is not likely to succeed on the merits of its Clean Water Act and National Environmental Policy Act claims. The first of those substantive issues is that the record shows substantial questions about whether the project may have significant impacts, and thus the court violated NEPA by relying on an environmental assessment instead of an environmental impact statement. The second of those substantive issues is the fact that the court violated the Clean Water Act implementing regulations when it concluded that the project is the least environmentally damaging practicable alternative. And then the third substantive issue is that the court failed to comply with the regulatory obligations to involve the public in the preparation of the environmental assessment. So on the standard of review, I think both parties in their briefs noted that typically, on an appeal from a motion from denial of a motion for preliminary injunction, the standard is an abuse of discretion standard on factual issues and de novo review of legal issues. Here, the district court denied the motion solely on the grounds, the legal grounds that the coalition was not likely to succeed on the merits of its claim. Let me ask you, you make a differentiation on factual issues. It's for clear error, right? Abuse of discretion, I guess. Abuse of discretion. But not abuse of discretion for the claim itself? For legal issues. Yeah. And here, all of the claims are Administrative Procedure Act claims. There's an administrative record. The district court in resolving these claims didn't make any factual determinations. He simply applied the law to the facts in the record. Well, I mean, the assessment that a claim is not likely to succeed seems to me to be inherently factual to the extent that it's built on his assessment of the facts of the case. And certainly whether the single email erupts into something else would certainly be at least tangential to a factual finding. But go ahead. Well, and I will just point the Court to two decisions of the Ninth Circuit that held just this, that the standard of review in this type of case, when the decision was just on likelihood of success of the merits, is de novo. And that's the Inland Empire case, which is cited and relied upon by the federal appellees and the intervener appellee, and the Headwaters case. And I don't have the year written down. I know there are many. But it's also cited. Is that somewhat different from our case in sports forum where we said mere disagreement with the district court's conclusion is not sufficient reason for us to reverse the district court's decision regarding preliminary injunction? Well, I'm not sure in that case whether there were also — there was also consideration of the other winter factors. Here the district court didn't get into the factual issues of irreparable harm, balance of the equities, public policy. It was solely based on this — the legal questions of whether the court — based on this record, whether the court violated its duties under the law. Sports forum was not an environmental case. It was a general rule of our court. Well, I guess what I'm saying is I'm not sure if there's a distinction with that case based on whether the district court ruled on all four of the winter factors or just on the legal — on the legal factors. Let me just ask. Claims under NEPA and CWA are reviewed according to the APA's arbitrary and capricious standard. Is that correct? That's correct. And under biological diversity, our review is very narrow. Your review of the core's actions, yes. Yes. That's correct. Thank you. And in this case, the core did not prepare an environmental impact statement. They prepared an environmental assessment to analyze the project's impacts. And the Ninth Circuit has been very clear on this point. An environmental assessment is not appropriate when the record reflects that there are substantial questions about whether the project will have significant impacts on the environment. That comes from the Ocean Advocates case where the court also noted that plaintiffs need not show that the significant effects will, in fact, occur, but raising substantial questions whether a project may have a significant effect is sufficient. So that's the standard under the Ninth Circuit case law for when an environmental assessment is appropriate versus an environmental impact statement. And the court has also said this test intentionally sets a low bar for the preparation of an environmental impact statement. And here the record shows that there were substantial questions about whether the project would have significant mercury and methylmercury contamination impacts. The highways plan to be constructed through soil that's contaminated with mercury and will run Is your argument primarily based upon this famous e-mail, the e-mail that does not express fundamental disagreement with the RTC plan in treating mercury? But is that the real, is that the smoking gun of your case? That's the smoking gun. There were actually two letters that EPA sent during the comment periods on the two separate applications for the project, which also conveyed these concerns. And then there were Conveyed concerns, but it didn't express any fundamental disagreement with what RTC planned to do in treating it. Well, the questions that were raised in those e-mails said, I have reviewed the evidence that you are relying on to say that this project won't have significant environmental impacts. And here are the places where there's no foundation, where there are unexplained assumptions in reaching conclusions. But there was no there was no in those e-mails. It did not express disagreement. Is that correct? I would say it raised questions. It did not provide answering my question. In the e-mail, it could say, and I disagree with. That wasn't in there. That was not in there. That's my point. So how does that e-mail then help you along the way? There's just been questions being raised. But the person who's rescuing the question doesn't disagree with the direction they're taking. Well, there are questions about whether there's actually evidence to support the conclusion that the Corps eventually reached, which was this project, as mitigated, won't have a significant impact. And the place where you look for that conclusion is the environmental assessments. That's where the Corps is required to explain its decision not to prepare an environmental impact statement. And in that EA, in the environmental assessment, the Corps does not convey these EPA questions about the substance of the analysis and about whether the mitigation will actually be effective. EPA also recommended both in the letters and then in the e-mails that they conduct additional studies. They said this mercury science, it's evolving, it's complicated, this is a serious issue, and here are some things you could do to resolve the questions. The environmental assessment doesn't convey those questions. In fact, on excerpts of record page 154 is the page of the environmental assessment where the Corps explains that comments were received, and it basically just says we received comments from the EPA on these topics, mercury, mitigation. It doesn't express any concerns reflected in those e-mails. And then in the response to EPA's comments, the environmental assessment simply says the applicants provided additional information about bank stabilization and mitigation, but it doesn't explain what the information is or why it responds to the EPA's concerns. And our argument is if the environmental assessment had contained that analysis, if it had said here are the concerns, here's why we don't think they're founded, here's what we did to respond to this one and that one, that might put us in the camp of Bering Strait or Akiak Native Community or Native Ecosystems Council, but that was not contained in the environmental assessment. There was no reasoned explanation for the Corps' conclusion and disregard of EPA's questions. And in the district court transcript, and I want to be careful, the transcript that's in the record contains the entirety of the oral argument on this, and the latter half is the district court's ruling from the bench. The earlier half is just the sort of question and answer. But in the question and answer period, when we were discussing this issue, the district court said, looked at this evidence and said that the Corps didn't leave EPA's questions unanswered. They, quote, answered them in their own mind. But that's not enough under the EPA or under the rulings of this court. Can I tell you what bothers me? Mm-hmm. I understand your argument. We've read your briefs. Here we had a preliminary injunction. The district judge took a cut at it as best they can with what's before them and make a decision. Did the case go forward after you lost the preliminary injunction? Did you go to trial on the issue? That decision was only made a couple of months ago. We're still waiting for the administrative record so that we can then proceed to summary judgment. There's no trial. It's a case on the record, cross motions for summary judgment. The concern is the road is going to be built by the time we get to summary judgment. The road building agency has been moving very quickly, and so that's why we took this immediate appeal. Well, I understand that. But we've taken a close look at these issues, and sometimes they come up without a full record. We've even said that the decision may be different if you wait for the appeal. We said that in sports form, and we made it clear as a court that we wanted people to proceed. Once you lose the injunction, proceed to trial as quickly as you can so that we don't have to give all of these benefits to the trial court. We can see the record, make a decision. You chose not to do that as a litigation position, or you're waiting in trial for the trial? We are actually waiting for the core, the federal government, to prepare the administrative record so that we can proceed on summary judgment. So that is out of our hands. We've stated in the record below we're prepared to brief things expeditiously, move as quickly, but the record preparation, which is the key to resolving the merits. Is district judge putting the government under deadlines to get this done so we can have a little case management going on here? There was no requirement or deadlines for preparing the record. Okay. You win on that one. Thank you. The next point I want to address is the Clean Water Act implementing regulations. The implementing regulations prohibit the core from issuing a Section 404 permit, a wetlands fill permit, if there is a practicable alternative to the project that would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other adverse environmental impacts. The regulations go on to define what practicable means, available and capable of being done after taking into consideration cost, existing technology, and logistics of overall project purpose. And importantly for this case, if a project is not water dependent, means does not need to fulfill its basic purpose to be built on the wetlands, then there is a presumption that practicable alternatives exist, and that presumption is not rebutted unless clearly demonstrated that there are no alternatives. Does that mean any alternative at all wins? Yes, as long as there is a practicable alternative. This is not a case where we're arguing for some new alternative that nobody ever looked at. We looked at the world of alternatives that the applicant itself presented and said, from even that discrete world, there are two alternatives where the core did not have a basis. The widening streets and the transfer of the apartments and the city someplace else. Yes. The district judge found that they weren't practical? The district court found that it was, as the core argued, it was self-evident that relocating businesses in the area made these alternatives impracticable. But the problem is that, first of all, in sort of related area of law case, in the Center for Biological Diversity versus National Highway Transportation Safety Association, the CAFE standards case, this court pretty expressly rejected a similar claim that it was self-evident that small reduction in greenhouse gases would be an insignificant impact. And here as well, we're dealing with a presumption that there are alternatives available and a requirement to clearly demonstrate otherwise. The simple statement that often it is very difficult to successfully relocate a business to a nearby location, particularly in areas where available properties are scarce, that general statement, there's no evidence in the record that in this area commercial properties are scarce, no estimate of the cost of relocation. And so without more, the court erred in concluding that the core had properly determined the least environmentally damaging practicable alternative. And I see I'm going into rebuttal time, but I'm happy to answer questions. So you can answer it before it's given. I suppose the other side is going to say, but we are dealing with the five acres that are no longer wetlands. We have done something with that issue. Where does that fit into the mix as you see it? The mitigation wetlands? Yeah. Yes, on appeal, our argument in terms of the substantial questions of a significant impact is focused on the mercury impacts of the project, which regardless of what they do to mitigate wetlands is its own standalone significant impact. However, in those famous smoking gun EPA emails, they noted that the creation of new wetlands itself can increase methylation of mercury, which is the significant impact here. So there is evidence in those EPA emails that there are at least substantial questions about whether the mitigation that they have chosen to mitigate the loss of wetlands will actually exacerbate the mercury problem in the area. Okay. Thank you. We'll hear from defendants, and before we start the clock, I should ask if there's any understanding as to how argument will be divided, if at all. Yes. My name is Erica Kranz. I'm representing the United States Army Corps of Engineers. I'd like to save five minutes for the intervener, or TC. So you're proposing to take 15, and the intervener has five. That's correct. Thank you. You'll keep track of your own time, won't you? I'm sorry? We don't want your co-counsel to blame us if you run over, so we ask you to keep track of time. That's right. I promised him five minutes. If a long hook comes out, you'll know why. May it please the Court. The Corps here spent a year and a half analyzing this project and prepared a 60-page EA, taking a close look at how the Southeast Connector is expected to affect the human environment. It worked closely with other agencies to improve the project and lessen its environmental effects. The Corps invited public comment, and those comments evinced the public's understanding of the issues at play. And the Corps has articulated a rational connection between the facts on the ground and its conclusion regarding the practicability of alternatives. And in doing so, the Corps complied with NEPA and Clean Water Act. Now, the Coalition is seeking the extraordinary remedy of a preliminary injunction, but it hasn't shown that the district court abused its discretion or applied an incorrect legal standard in denying its motion for preliminary injunction. Now, we were just talking about standard of review. The Lands Council case, an en banc case of this Court, articulates that standard of review and makes clear that so long as the district court applied the correct legal standard, even if this Court might have applied it differently to the facts, that decision should be upheld under that abuse of discretion standard. So I'd like to start with the claim that the EIS was required, then move on to the draft EA claim, and then finally the Clean Water Act claim. First, the Coalition is raising the question about whether an EIS is required here. The question is not whether any uncertainty or controversy exists, but whether there's a substantial dispute about whether environmental effects will be significant, meaning these factors are so intense that the government must continue its review and prepare an EIS. Now, the Coalition is focusing on this so-called smoking gun email from EPA about how the project is going to interact with existing mercury contamination. Now, it's important to remember that the question here is not whether this project is going to solve all of the mercury problems in this area, because we know that Steamboat Creek is quite contaminated with mercury from historic gold mining operations upstream, and we know that mercury methylation is occurring in this area already. So the question isn't whether the project is going to solve all of those problems, but whether the project is going to cause significant new problems. And the Corps reasonably determined that it will not. That determination must be upheld unless arbitrary and capricious. Now, as a preliminary matter, the extensive dialogue between the Corps and EPA shows that the Corps was taking its environmental review seriously. The record also shows that the Corps responded to EPA's comments. It asked RTC for more information. It conducted its own analysis. It requested changes to the project and to the mitigation. And it imposed substantive permit conditions, including regarding mercury monitoring and development of an adaptive management plan. Now, relevant to the Coalition's concerns about mercury methylation, the Corps asked RTC to revisit its wetlands mitigation plan after that EPA email. So the mitigation plan, as it stands now, responds to EPA's concerns that new wetlands could actually cause additional methylation. Now, the way that the Corps and RTC addressed that concern was it chose a new wetlands location that's been thoughtfully chosen to avoid the methylation issue. First, the new wetlands location, unlike where existing wetlands are located and where the initial mitigation wetlands were proposed, this new wetlands area first is located in an area that does not have mercury-contaminated soils. Is that the new five-acre? It's a new 22-acre wetlands complex. The old one is five? Initially, RTC was proposing wetlands in at least two different locations. Now, all of the mitigation wetlands will all be located in the Uri Drain area. Okay, and that has no evidence of any problem right now. Right, so that area does not have contaminated soil. One reason it doesn't have contaminated soil is it's not fed by Steamboat Creek, which is the contaminated water source. The wetlands that are going to be located at the Uri Drain area are fed by water that originates in the Truckee River and also urban runoff and drainage. So there's not going to be mercury there that could methylate, causing a significant new methylation problem. And as an added benefit, wetlands in that area are expected to help filter out other contaminants coming from that urban runoff that could then flow into Steamboat Creek. And the Corps didn't reach these conclusions on its own. The Nevada Division of Environmental Protection's Bureau of Water Quality, which was responsible for issuing a certification that this project won't violate the state's water quality standards, that office agreed that the project was designed to avoid mercury methylation because the new location of wetlands isn't expected to cause additional problems. And it agreed that those new wetlands are expected to help reduce other contaminants. RTC has also changed the way that they are grading areas that could be flooded by Steamboat Creek. And that positive grading is going to allow water to flow back to the creek relatively quickly so that water will not impound in low-lying areas, which can create the anoxic conditions that contribute to methylation. The Nevada Bureau of Water Quality also looked at that and agreed that the positive drainage would help with the methylation problem. The U.S. Fish and Wildlife Service also looked at these issues. They were involved because they were examining whether there would be harms to downstream fish species, and they agreed the project should mitigate the creek's mercury issue by designing wetlands that won't contribute to methylation. Now, there's another – Counsel, your co-counsel is looking anxious at this point. Are you going to exceed – you've exceeded your five minutes. No. She's taking 15. He's taking five. I'm taking 15. I beg your pardon. So if he's looking anxious, it's for some other reason. You can speculate what it is. We should give you another reason for that, David. As long as you're interrupted, this CH2M Hill, the organization that did the Environmental Consulting Agency, was that report considered by the district judge? Yes, I believe so. I believe that was before the district judge. And it strikes me that you've gone outside just to your own folks, to other people, and that very often is important to the judge. Do you recall whether or not the judge put emphasis of any type upon that independent Environmental Consulting Agency? Well, that was an independent study commissioned by the project applicant, which the Corps then considered in reaching its own conclusion. So since it's the Corps' decision that's under review here, I suppose the district court considered it to the extent it supported the Corps' decision, which it did. I want to move on to the second mercury issue, which is the issue of mercury transport, separate from the issue of mercury methylation. That has also been studied. RTC is removing and sequestering a large quantity of contaminated soils, permanently removing that mercury from the environment where it could come into contact with humans. The Nevada Division of Environmental Protection Superfund Branch looked at that plan and agreed that this should help keep mercury from coming into contact with humans and was consistent with how other contaminated areas have been managed. Indeed, that agency said this plan presented a clear benefit to the existing condition. And RTC is going to reshape the banks of Steamboat Creek within the project area, where those banks have become deeply incised, which has led to increased erosion. The Fish and Wildlife Service looked at this issue as well and agreed that bank stabilization should help prevent additional mercury transport downstream. Let me go back to your discussion of mercury. The record shows that the EPA is concerned with at least two conclusions in the RTC's March 2014 technical memo. The mitigation plan of isolating 10,000 kilograms of mercury beneath the roadway. And are you saying there was a reasonable explanation to answer that? Also, the 43 kilograms of mercury the RTC estimates will be deposited on the floodplain after a century. How important are these conclusions at this point? Well, I don't think it's terribly important what those precise numbers are. I mean, what's clear from the record is that a very large quantity of contaminated soils are going to be isolated and encapsulated, sequestered, separated from the human environment. Whether it's 10,000 kilograms or some other number, it's a large number. RTC's analysis that led to the 43 kilograms number also said that that was a highly conservative estimate, possibly even an impossibly conservative estimate that was assuming that all mercury was being deposited on that floodplain. I don't think the law of this Court does not require the level of precision that plaintiff is asking for here. Let me ask you about the alternative that was suggested of widening and improving existing streets only and the McCarran widening. As I understand it from my limited review of the record, that your position is it's not a valid alternative because of extensive cost. Well, that is a good position, except your opponent indicated that there's no pricing that's put on. It's just a general statement. If the prices are there, what are they? If they are not there, why is that generalization sufficient? The Court did not rely on cost to reject those alternatives. It relied on ñ it considered those alternatives logistically impracticable, and that was because of the logistics involved in moving a large number of homes, apartments, and commercial properties. I mean, we're talking about 95 to 155 homes, 65 to 120 apartments, and 100 acres of commercial property. So you never costed those out? I believe RTC's application included some explanation of cost, but the courts in the EA, the courts' reasoning for rejecting those alternatives was based on logistics. What's that mean? What's logistics? It means what is capable of being done. And it doesn't mean anything that is completely possible in the world, but what's realistically capable of being done. And here we have Nevada statutes that require when you're moving a business that you move that business to a suitable replacement property in the nearby area. It can't just go anywhere. And the court was satisfied here that the applicant had rebutted the presumption that practical alternatives existed, and the court's determination should be upheld unless arbitrary and capricious. And we would submit that the district court got it right in that case. Well, logistics, I mean, if for some reason, if it's World War II and they decide the Manhattan Project needs this property, lots of things can be done if you're willing to throw enough money at the property. I guess I'm still not sure what it means to say it's not logistically practicable. If they could do it with relatively modest cost, why would that mean it's impractical? Well, cost is a separate consideration from logistics, although I suppose they could be related. What's important here is that the court was satisfied that it was logistically impractical. The coalition hasn't raised anything to rebut that. There's simply nothing in the record suggesting that it is anything but impracticable. Well, they've certainly challenged whether the district court had sufficient basis to make an evaluation there. In this case, you don't even have a district judge who's in the community, which I've got to say is always a wonder. Why do we have a judge from Sacramento dealing with this case? I believe it was because the core office that issued the permit was in Sacramento. Okay. But the judge, we don't know what, if any, familiarity he had with the area. So what's the district court's assessment based on? Well, it's based on the record. The and the. Well, what is the record? I think it's. Well, the record shows the sheer number of relocations that we're talking about here. It's a large number. And the court talked not just about the relocation, but also the disruption to the community that it would cause. There's enough here that the district court was correct, did not abuse its discretion in finding that the core had acted reasonably in reaching this conclusion. Frankly, reading the briefs, the thing that bothered me the most was the failure to give reasoned explanations for the most part, raising the issue of whether an EIS should be issued. And your response is removal of businesses, et cetera, et cetera, to this judge appeared to be reasonable. Were there any other facts involved in that decision? With regard to the Clean Water Act? Yes. I believe it was essentially the number of businesses, the Nevada statute that applies here, that is restrictive about where and how you can move a business. And then the disruption to the community. Those were the factors articulated in the CORE's analysis. And I want to point out also, although this isn't in the CORE's EA, but it lends some context. RTC looked at whether those widening alternatives could actually meet the project's purpose and determined that they would not. So, you know, beyond even the logistical practicability, they were not a way of meeting the project's purpose. I want to touch on the third issue just very briefly because I do owe the intervener some time. But I want to make clear that in terms of circulating the draft EA, the regulations that apply here as a default do not require that process. This does not present one of the situations where one of the limited circumstances where circulation is required. This is not a situation that normally requires an EIS. The CORE's own regulations explicitly state that a permit application is a situation where an EA is normally prepared. And as we've been talking about, this isn't a case that presents an exception to that rule. This Court has also declined to require a rigid and formal process. Instead, in the Bering Strait case, it said the agency has to give the public sufficient information, considered the totality of the circumstances, to allow the public to inform the agency's process. And what we have here is the coalition and other environmental organizations and interested individuals making germane comments and other agencies giving information to the CORE that helped the CORE and RTC shape this project. That's the way that NEPA is supposed to work, is public comment informs the NEPA process and helps make the project better. And that's what happened here. Why was a FOIA request required? Well, a FOIA request is the way that EAs and FONDIs are made available to the public under the CORE's regulations. Someone who wants a copy of that should submit a FOIA request and the agency will make it available. In a circumstance where things are on a fast track, that seems odd to me because it seems counter to the notion of making information available. It's simply going to take up more time, isn't it? It took a total of three weeks here. You know, the plaintiff has implied in their briefing that it did not have the documents it needed to make its preliminary injunction motion. That's not accurate. It had the EA by the time it filed its preliminary injunction motion. It had all the information it needed. This took longer to get it than probably it should have. It may have. But we would submit that even if there was a technical violation there, the — enjoining this entire project would not be an appropriate remedy for that. So I'd like to give the intervener the last couple of minutes. Yes. Yes. No trapdoor will open up at 152. Thank you, Your Honor. Ed Cohen for RTC of Washoe County. Obviously, we join the CORE's arguments and positions, and in my brief time, I'd like to just supplement those points. The points I wanted to make were and would like to make are that the project has substantial benefits, some of which the DOJ counsel touched on, and those are very important for this community. It's a net positive for the community. Secondly, NEPA worked here. Third, if our position clearly is that an injunction is not merited or justified under the law, the facts of this case, but if the Court were to consider that, we want to make sure — I would be remiss if I did not point out that from the RTC's perspective, that the bottom line is there would be substantial harm to RTC and to Washoe County if there were an injunction considered. In addition to that — Well, the district court didn't get there, did it? No, sir. So we don't have anything from the district court on that subject? Correct. And I think the counsel's briefs ultimately agreed that with factual issues still there, if the Court were to consider this issue, it needs to go back to the trial judge for the other three winter factors to be analyzed. Again, our position is to be clear that we don't believe that issue should be raised respectfully. I do want to touch on a couple of things that were brought up in questioning by the DOJ counsel, and that deals with the addressing of the LEDPA issue under the Clean Water Act. And that issue, in a nutshell, the Corps did examine the issue carefully. In their 66-single-paged EA FONSI, they spent 33 pages discussing their analysis of what is practicable, which is the question under LEDPA, that's the P, the practicable. Is it practicable? Is it not practicable? That's the ultimate question that we're talking about here under alternatives for a project that will go through wetlands. And so in their 33 pages, they analyzed these various issues, and they found, and they gave their reasoning for it, the Widening Streets McCarran issue not being practicable, and it was based on logistical issues. I do believe there's an undercurrent there that cost is obviously related, because it is self-evident that if you are moving, and this is in the record, 100 acres of commercial properties under Nevada's law, which is very specific in how you have to find very appropriate similar types of properties, it puts a lot of logistical constraints. In addition, 100 to 200 homes plus apartments to do the widening. In addition, it was deemed that it didn't meet the purpose and need by RTC, and that was in the application that's in the record. As a result of that, the court correctly determined that this alternative is simply not practicable, and that gets it over the presumption, and therefore, we end up with the LEDPA being the path where the SEC is being built today. What about the position of your opposition that says you've got to cost it out so we know how much it costs? We don't know it's impractical until we know how much the cost would be. Your argument is self-evident or? Yes, Judge Walters, it is. And the reason is because with the – it is self-evident as the cost, but it also as the core found and should be deferred to because of the presumption of regularity. The core should be deferred to on this issue. But – because they also found that it would be impractical, logistically speaking, to try to find comparable properties for 100 acres of commercial businesses, plus 100 to 200 homes, plus apartments, especially when the RTC had already said, this route, because it doesn't parallel the SEC, won't do the job, it won't meet the purpose of the whole project. It doesn't get the job done. If we do that, it doesn't meet the purpose. And therefore, the practicality issue is carrying the day. But if it doesn't meet the purpose, it also can't be the LEDPA. It can't be used. It was ruled out or taken out of play. Here, the bottom line is NEPA worked. There was tremendous input. The coalition availed itself of that. That is what the process is about. They don't like the result, but the core did look at this carefully, and Judge where he did look at facts, the facts that were presented of the record that's before a judge in a preliminary injunction hearing. He looked at those. He looked at those carefully, and he analyzed them. I believe a question did come up about why is the EA FONSI, it leads to the question of prejudice of the plaintiff having to FOIA the EA FONSI and not getting it until May 4th. One thing I would like to just point out, that in the plaintiff's, the coalition's brief, the reply brief at this court, page 23, the coalition attempts to explain to the court how it's prejudiced by that three-week delay that the court asked about today. The brief specifically says, quote, during that time, meaning up until May 4th, quote, RTC went forward with construction of the project causing irreparable harm to wetlands, end quote. That is just wrong. That is belied by the coalition's own briefing at the trial below, ECF 5-1, their memorandum in support of their motion for preliminary injunction. They specifically acknowledged and explained to the court, basically explaining why they didn't seek a TRO and just sought a preliminary injunction. They say on page one of their own brief, construction didn't commence until June 1st. Pre-construction activities did commence before that, but the RTC was very open with the coalition when they asked when we were having these proceedings as counsel should be in preparing for a preliminary injunction. Okay, you're now more than six minutes into your five minutes. Is there anything else you need to tell us? No, Your Honor. Respectfully, the RTC's position, obviously, is that we believe Judge Mendez, the court, and Judge Mendez both gave the issues a hard look and came to the correct conclusions and should be affirmed. Thank you. Thank you. Thank you, Your Honors. I'll be brief. I just want to address one point that just came up about what was contained in our brief. There were three weeks of pre-construction activities, and that was incorrect in our brief. They didn't fill any wetlands during those three weeks, but they did do ground-disturbing activities and they proceeded apace. And by the time we got to the hearing on preliminary injunction, of course, RTC's argument was we are on a path, a critical path of construction. Any delay now will cost us tens of thousands of dollars. So construction commenced while the public remained in the dark about what the court's reasoning was in the environmental assessment. And then one other just quick correction here. The alternatives analysis that was discussing the two road-widening alternatives, it's two paragraphs. It's on Excerpts of Record, page 163. There are not 33 pages in the EA devoted to analyzing these two alternatives. And the last point I'll make and... And they both conclude with the same proposition, which is the one we've been arguing about. Well, is the alternative practicable? What's the contest here? Frankly, moving a whole bunch of houses and a whole bunch of businesses sounds like it's burdensome. Why is it something that should have been pursued further? Well, I would first point out that the fact that Nevada has this statute is just evidence that this is common practice. Anytime you have to do a road construction project, any sort of public project where you're condemning homes, which happens all the time, you have to relocate. That's just the standard practice. So there's nothing extraordinary about having to do that here. And the second point is, OK, maybe if they had provided some evidence that it was difficult to find nearby locations for businesses, maybe that would have gotten them some part of the way, but there's nothing in there. And the court doesn't have any technical expertise in the commercial real estate market in Reno, Nevada. There's no reason to defer to its conclusion on that. There just simply is nothing in the record on this logistical point. And the last point I'll make is since I didn't get to talk about the notice issues in my opening remarks, and they did address it in opposition, you know, I could go through the regulations, but the regulations, the language of the regulations, make clear that agencies shall, they are required, they are encouraged, they are mandated to involve the public to the fullest extent possible in decisions which may affect the quality of the human environment. And here, the court took two steps. They issued a notice of the project application in August 2013, and then on April 15th or 16th of this year, they posted a press release on their website saying, we've issued the permit, we've prepared an EA, and then they told us, of course, if you want to actually see the EA, you have to submit a FOIA request. Regardless of anything else, those two steps cannot be considered to be involving the public to the fullest extent possible. Well, involve the public, they argue, earlier, even if they were somewhat miserly about making the assessment available, but by that point, they say they've made their decision and they're just throwing up obstacles to the subsequent litigation. But I'm not sure that speaks to the public comment obligation they have in the course of the assessment. Is there anything you can point to where an opportunity wasn't given for people to comment? Well, my client was extremely diligent throughout this process in submitting repeated FOIA requests to the Corps to obtain information. The Corps did not affirmatively notify the public, for example, when there was the change in the location of wetlands mitigation, when there were new reports, new technical memoranda. This, of course, my diligent client received because they were on top of it and were asking for it and were entitled to it. And yes, we submitted comments and no, the Corps did not cover its ears and say we won't listen to them, but that's not involving the public to the maximum extent possible to put the burden on the public to stay on top of this and to continue to submit comment after comment without knowing what the Corps' reasoning or thoughts are on the impacts of the project. Thank you. Thank you. We thank all counsel for your helpful comments. The case just argued is submitted. That concludes this morning's calendar. We're adjourned.
judges: Wallace, Nelson, Clifton